UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STUD STEPHENS,

    Plaintiff,

v.                                                      Case No. 8:10-cv-2787-T-27AEP

MANATEE COUNTY,

    Defendant.
_____/

ORDER

BEFORE THE COURT is Manatee County's motion for summary judgment on Counts Two, Four, Five, and Six of the Second Amended Complaint (Dkt. 66). Stephens, proceeding *pro se*, has responded in opposition (Dkt. 69). Upon consideration, the motion (Dkt. 66) is GRANTED.

**Background**

This is an action involving claims of race discrimination and violations of the Family Medical Leave Act. Summary judgment was entered in favor of the County on Count One, which is Stephens' claim that he was terminated on account of his race, and Count Three, which is Stephens' claim that he was terminated in retaliation for requesting FMLA-protected leave (Dkt. 65). The remaining counts relate to the contention that the County wrongfully failed to place Stephens in an Operator In Charge/Senior Operator position (Counts Two, Four, and Five) and the contention that Stephens was not afforded sufficient due process at his pretermination hearing (Count Six).[1] The facts relevant to Counts Two, Four, Five, and Six follow.

In 2008, Manatee County assumed control of a new bio-solids dryer facility, which is a facility where waste sludge is converted into a fertilizer product. To staff the new facility, the County

---

[1] The counts in the Second Amended Complaint are not well-defined, and many overlap claims in other counts.

reclassified three of its employees from "Waste Water Plant Operators" to "Bio-solids Dryer Operators," James Fulford (Caucasian), Matthew Duff (Caucasian), and Joseph Robinson (African American). The County also advertised one or more open positions in the bio-solids dryer facility.

Stephens, an African American, submitted an online application for the position of Bio-solids Plant Operator II. (Verified Second Am. Compl. ¶ 12). The job description for the Operator II position required "[p]rior experience related to the operation of mechanical and electrical equipment," which Stephens had obtained through prior employment. (*Id.*). The County hired Stephens for the Operator II position on May 27, 2008. (*Id.* ¶ 14). At that time, Stephens held a Class B Waste Water Treatment Plant Operator's license. (Dkt. 70, Stephens Aff. ¶ 19[1-b]).

On or about June 21, 2008, Fulford was designated Operator In Charge ("OIC") of the bio-solids dryer facility. As the County's Compensation and Employment Manager explained, OIC "was not a distinct position but was instead a temporary duty status which afforded anyone holding the designation added pay." (Dkt. 66-1, Basset Aff. ¶ 7). The employee holding OIC status was required to "make decisions and accept responsibility for plant operations" at times when "no member of the management/supervisory chain of command was available." (*Id.* ¶ 8). Under County policy, the most qualified employee was designated OIC, which was determined by the level of license held by the employee, his or her seniority, and other factors such as initiative and career advancement. (*Id.* ¶¶ 7-8, Comp. Ex. B). As the County's internal records show, A-licensed operators were to be given OIC status first, followed by B-licensed operators, and then C-licensed operators as a last resort. (*Id.*, Comp. Ex. B). When he was designated OIC of the bio-solids dryer facility, Fulford held a Class A license, was an Operator III, and had previously been OIC of another facility. (Verified Second Am. Compl. ¶ 33(h); Dkt. 66-1, Bassett Aff. Comp. Ex. B at 20).

Stephens obtained a Class A license the following year, on June 30, 2009. (Verified Second

Am. Compl. ¶ 21). On July 10, 2009, Stephens asked the County Superintendent, Steven Burkett, when a "Senior Operator" position would be open. (*Id.* ¶¶ 23-24). Burkett informed him that he did not know anything about the position. (*Id.* ¶ 24). Stephens then inquired why Fulford retained OIC status when he was transferred from another facility, but Robinson, who held OIC status at a different facility, was not made OIC of the bio-solids dryer facility. (*Id.* ¶ 25). Burkett stated that he did not know, and that other individuals were responsible for making those designations. (*Id.* ¶ 26).

On July 17, 2009, Stephens received an email from his supervisor which stated:

> It has come to my attention that some may not have known their job titles. Job titles are as follows:
>
> Christian Collins- Bio-Solids Supervisor/M.A.R.S Supervisor
>
> Paul Fulford- Operator III, Senior Operator
>
> Stud Stephens- Operator III
>
> Matt Duff- Operator II
>
> Joe Robinson- Operator II

(Dkt. 69-1 at 24; Verified Second Am. Compl. ¶ 27). On or about July 18, 2009, the supervisor informed Stephens that Fulford was in charge of the bio-solids plant operations. He stated, "follow his instructions, [and] no matter what he tells you to do . . . , you do it and don't write anything down. He's my Senior Operator in charge." (Verified Second Am. Compl. ¶ 28).

On January 27, 2010, the County terminated Stephens' employment for abandoning his post, leaving dangerous equipment running, and falsifying time records and maintenance records. (The facts surrounding Stephens' termination are set out in detail in the prior summary judgment order (Dkt. 65)). Before his termination, Stephens was given notice of the charges against him and a hearing at which the County summarized the evidence and offered him the opportunity to explain

what had happened. Stephens also received a post-termination hearing, where he appeared through counsel and was afforded the opportunity to testify, to offer exhibits, to call witnesses, to cross examine adverse witnesses, and to make a closing argument. After the hearing, the County officer issued a recommendation that the County had just cause to terminate Stephens, which was formally adopted by the County administrator. (Dkt. 45-4).

Shortly after his termination, Stephens filed a discrimination complaint pursuant to the Manatee County Commission's Personnel Policy. After a lengthy investigation, a report was issued which found no illegal discrimination or retaliation.

Proceeding *pro se*, Stephens commenced this action. Partial summary judgment was entered on Counts One and Three of the Second Amended Complaint, as discussed. With leave of Court, the County filed a motion for summary judgment as to Counts Two, Four, Five, and Six. An order was entered informing Stephens of the requirements of Fed. R. Civ. P. 56. (Dkt. 67). Thereafter, Stephens filed several documents, including a response to the County's motion, numerous exhibits, and an affidavit. In addition, Stephens requested leave to file a third amended complaint to assert a claim that he had applied for a "Senior Bio-solids Dryer Operator III" position[2] but the County wrongfully failed to hire him for that position.[3] Because the discovery deadline, the dispositive motion deadline, and the deadline to amend pleadings had passed, Stephens' request for leave to amend was denied. (Dkt. 74). The order specifically rejected Stephens' argument that the County concealed certain documents which were filed with its summary judgment motion, because Stephens failed to show that any of the documents were subject to a discovery request. (*Id.*).

---

[2] In the Verified Second Amended Complaint, Stephens averred that he applied for the "Bio-solids Plant Operator II" position. (¶ 12).

[3] Although the County initially hired Stephens for the Operator II position, it appears that he had been promoted to Operator III by the time his supervisor sent the July 17, 2009 email.

Notwithstanding that leave to amend was denied, Stephens' affidavit and response to the summary judgment motion place considerable reliance on the claim that the County wrongfully failed to hire Stephens for a "Senior Bio-solids Dryer Operator III" position. This claim was not presented in the Second Amended Complaint and, because leave to amend was denied, it is not part of this action. Accordingly, any references to the County's failure to hire Stephens as a "Senior Bio-solids Dryer Operator III" or any other proposed amendments cannot be considered on summary judgment. Stephens' response, exhibits, and affidavit are therefore limited to the evidence supporting the claims in the Second Amended Complaint. Based on that evidence, there are no genuine issues of material fact, and Manatee County is entitled to judgment as a matter of law.

### Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

After a properly supported motion for summary judgment has been made, the nonmoving party must "cit[e] to particular parts of materials in the record" showing a genuine fact issue or to demonstrate that the materials cited by the opposing party fail to show the absence of a disputed issue of fact. Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

All justifiable inferences and all reasonable doubts about the facts should be resolved in favor

of the nonmoving party. *Hickson Corp.*, 357 F.3d at 1260. The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). "Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party." *Id.*

## Discussion

### Failure to Promote

Stephens argues that he should have been made OIC/Senior Operator when he was hired.[4] Stephens contends that, because of his race, Fulford was instead designated OIC. Under Title VII, employers, including county officials, are prohibited from discriminating on the basis of race. 42 U.S.C. § 2000e-2(a). A claim of race discrimination can be established by direct evidence, circumstantial evidence, or statistical proof. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Stephens relies solely on circumstantial evidence.

A circumstantial case may be established using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination in a failure to promote case, the plaintiff has the burden of showing: "(1) [he] is a member of a protected class; (2) [he] was qualified and applied for the promotion; (3) [he] was rejected despite [his] qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). If these elements are satisfied, the employer must show a legitimate, non-discriminatory reason for failing to promote the employee. *Id.* at 1089-90. If the employer

---

[4] The designation "Senior Operator" was synonymous with OIC status. In the Verified Second Amended Complaint, Stephens quotes the following findings of a Final Investigative Report: "Mr. Collins stated the Sr. Operator title refers to the OIC[,] as this is the person that is in charge to run the shift and the go to person when he is not there," and "a 'Senior Operator' appears to have [been] used in Utilities over time as an informal 'working title' or 'honorary designation' only to identify the OIC." (Verified Second Am. Compl. ¶¶ 33(j), (m)). This is further supported by the supervisor's July 18, 2009 comment that Fulford is the "Senior Operator in charge." (*Id.* ¶ 28).

satisfies this burden of production, "the plaintiff must then establish that the proffered reasons for promoting another instead of the plaintiff were pretextual." *Id.* at 1090.

Stephens failed to demonstrate the fourth element of a prima facie case, that "an equally or less qualified" Caucasian employee was designated OIC. Stephens appears to argue that he had more extensive experience due to his prior work in a bio-solids dryer facility. However, in selecting an employee for OIC status, the County considered the employee's license level, seniority, initiative and career advancement. When Stephens was hired, Fulford held a higher Class A license and had greater seniority, with at least five years of wastewater plant experience with the County.[5] Fulford was therefore more qualified to be OIC than Stephens, regardless of whether Stephens had specific bio-solids dryer experience. To the extent Stephens contends that he should have been made OIC after receiving his Class A license, his argument fails, because there is no evidence that the OIC position was available. To the contrary, it appears that Fulford continued to hold the OIC designation for the bio-solids dryer facility.

Further, the County had a legitimate nondiscriminatory reason for designating Fulford OIC, as he had been employed by the County for several years and held a higher level license. For his part, Stephens failed to demonstrate that this reason was pretextual. Evidence that Robinson previously held OIC status but was not made OIC of the bio-solids dryer facility is unpersuasive, as Robinson held a lower Class C license. County policy was clear that C-licensed operators would only be OIC "as a last resort" or "in emergency situations." (Dkt. 66-1, Bassett Aff. Com. Ex. B at 24-27). And the undisputed evidence shows that two bio-solids dryer facility employees, Fulford and Stephens, held higher licenses than Robinson. Stephens therefore failed to establish a prima facie case of

---

[5] It is unclear precisely how long Fulford had been employed with the County. County records show that he was made OIC in the Southeast Sewer plant as early as 2003.

discrimination and, further, failed to show pretext.

**Retaliatory Discharge**

Stephens alleges that he was wrongfully discharged in retaliation for inquiring about Fulford's qualifications and for opposing discriminatory hiring practices and race discrimination in the workplace. Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Where, as here, there is no direct evidence of discrimination, "a plaintiff in a retaliation case must establish a prima facie case by showing that (1) the plaintiff engaged in a statutorily protected activity; (2) the employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse action." *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998).

Stephens' claim fails at the third prong. The causal connection requirement "is satisfied if the evidence shows that the protected activity and the adverse action are not totally unrelated." *Berman*, 160 F.3d at 701. As discussed in the order granting the County's motion for summary judgment on Counts One and Three (Dkt. 65), the undisputed evidence shows that Stephens was terminated for abandoning his post, leaving dangerous equipment running, and falsifying time records and maintenance records. Stephens has not offered any evidence to show that his termination was "not totally unrelated" to any protected activity.[6] Accordingly, Stephens' claim for retaliatory

---

[6] To the extent Stephens relies on the temporal proximity between his actions and his termination, his argument is rejected. The only protected activity Stephens identifies is his July 10, 2009 meeting with Burkett, which was six months before his termination. While Stephens avers, "[o]n or about the months July, August, September, October and November of 2009, plaintiff did engage in a statutorily protected activity" (Dkt. 70, Stephens Aff. ¶ 14(a-4)), such conclusory statements are insufficient to avoid summary judgment. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

In addition to his termination, Stephens appears to suggest that the "adverse employment action" was the July 13, 2009 email from his supervisor. Yet, he has not shown that the email represented any sort of demotion. Nor has he shown that an adverse employment action arose when the OIC received credit for work assignments that he and other employees completed. In any event, the evidence Stephens cites does not support such a contention. To the extent Stephens relies on the termination of Robinson, that is not an adverse employment action against Stephens. And further,

discharge fails.

**Deprivation of Rights Secured by the Equal Protection Clause**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Stephens alleges that the County violated his right to equal protection "by concealing and depriving plaintiff of the opportunity to apply for the (OIC) Operator in Charge position and by dismissing plaintiff for opposing the appointment of James P. Fulford of whom [sic], who was appointed after plaintiff was hired." (Verified Second Am. Compl. ¶ 116). Although it is less than clear, Stephens' claim appears to be that the County discriminated against him, individually, rather than against any particular protected class. To the extent he is making such a claim, it must be rejected. The Supreme Court has made clear that "the class-of-one theory of equal protection has no application in the public employment context." *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 607 (2008).

To the extent Stephens argues that the County treated similarly-situated persons in a different manner based on their race, his claim also fails. "Section 1983 actions challenging racial discrimination under the equal protection clause and Title VII disparate treatment cases both require a showing of discriminatory motive, and the nature of a *prima facie* showing is the same in either case . . . ." *Busby v. City of Orlando*, 931 F.2d 764, 777 (11th Cir. 1991) (quotation omitted). As discussed, Stephens failed to make a prima facie case with respect to his failure to promote claim and his retaliation claim. And as discussed in the prior summary judgment order, Stephens failed to establish a prima facie case on his claim that he was terminated on account of his race. (Dkt. 65).

---

Stephens averred that Robinson was terminated for failing a urine test. (Verified Second Am. Compl. ¶ 29).

Moreover, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see Busby*, 931 F.2d 764 at 776. "[T]o demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice," as opposed to a single incident. *McDowell*, 392 F.3d at 1290 (quotation omitted). While the County arguably had a policy of not advertising OIC openings, Stephens has not presented any evidence to show that the policy constituted deliberate indifference to the Constitutional rights of African Americans. Indeed, the undisputed evidence shows that African American employees were awarded OIC status. (Dkt. 66-1, Bassett Aff. ¶ 8).[7] And Stephens averred that Robinson had been designated OIC at a different facility. Accordingly, the County is entitled to summary judgment on Stephens' equal protection claim.

**Disparate Impact**

Under Title VII, an unlawful employment practice may arise where a facially-neutral employment policy has a discriminatory effect. 42 U.S.C. § 2000e-2(k). Stephens alleges that the County's "entry level Job Code # 397.003 [Bio-solids Dryer Operator II] required Prior Experience [which] caused a disparate impact on the basis of race which was not job-related and consistent with business necessity." (Verified Second Am. Compl. ¶ 119).[8] Specifically, the job description required "[p]rior experience related to the operation of mechanical/electrical equipment." (Dkt. 69-1 at 1).

---

[7] In addition to her averment, Bassett attached documentation showing the names of all employees who received OIC status. However, the race of the employees was not identified, either in the document or in Bassett's affidavit. Stephens, however, does not dispute Bassett's averment that both Caucasian and African American employees held OIC status.

[8] To the extent Stephens asserts that the job description for Bio-solids Dryer Operator III caused a disparate impact, such a claim is not part of this action, as discussed.

There is no question that the Bio-solids Dryer Operator II job description was facially-neutral. The only issue is whether the job description had a disparate impact on African Americans.

To establish a prima facie case for a disparate impact claim, a plaintiff must identify "statistical disparities in the employer's work force," "identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities," and "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *see* 42 U.S.C. § 2000e-2(k).[9] Stephens, however, has not identified any statistical disparities in the Bio-solids Dryer Operator II workforce. To the contrary, the undisputed evidence shows that three individuals held the Bio-solids Dryer Operator II position: two African Americans (Stephens and Robinson) and one Caucasian (Duff). The job description therefore did not have a disparate impact upon African Americans.

Stephens' argument appears to be that he was required to have bio-solids dryer facility experience, but the other employees were not.[10] The County acknowledges that Fulford, Duff, and Robinson did not have experience operating that type of facility. But the County points out that this was its first bio-solids dryer facility, and "it was not reasonable to assume everyone staffing the facility initially would have such experience." (Dkt. 66-1, Basset Aff. ¶ 6). Accordingly, the County ensured that Fulford, Duff, and Robinson, who were licensed operators, worked alongside private

---

[9] With respect to the third part, "the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i).

[10] To the extent Stephens contends that only African Americans were required to have experience before holding the Bio-solids Dryer Operator II position, his argument is rejected. The undisputed evidence shows that Duff, who was a Waste Water Plant Operator II, was reclassified as Bio-solids Dryer Operator II. Robinson was a Waste Water Plant Operator I, and therefore, he was initially reclassified as Bio-solids Dryer Operator I. Based on the July 13, 2009 email, it appears that Robinson was later promoted to Operator II.

contractors to obtain the required experience by the time the County assumed control of the facility. (*Id.*). This is a reasonable explanation which satisfies the County's "burden of producing evidence that its employment practices are based on legitimate business reasons." *Watson*, 487 U.S. at 998. Stephens has not offered any evidence to show that this practice "operated as the functional equivalent of a pretext for discriminatory treatment." *Id.* To the contrary, the undisputed evidence shows that African Americans (Robinson) and Caucasians (Fulford and Duff) benefitted equally from the practice. Accordingly, the County is entitled to summary judgment on Stephens' disparate impact claim.

**Deprivation of the Right to Procedural Due Process**

Stephens alleges that he was denied procedural due process in the pretermination hearing. As discussed in the order denying Stephens' motion for summary judgment (Dkt. 65), the undisputed evidence shows that Stephens was afforded a pretermination hearing that satisfied the requirements of *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985) and *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994) (en banc). To the extent Stephens argues that he was not given sufficient notice of the pretermination hearing, or that the pretermination hearing failed to satisfy all statutory or regulatory requirements, his arguments are rejected. It is well-settled that "the process a state provides is not only that employed by the board, agency, or other governmental entity whose action is in question, but also includes the remedial process state courts would provide if asked." *Horton v. Board of Cnty. Comm'rs of Flagler Cnty.*, 202 F.3d 1297, 1300 (11th Cir. 2000) (citing *McKinney*, 20 F.3d at 1561-65). Accordingly, a procedural due process claim will only arise if the state "fail[s] to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest...." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000); *see McKinney*, 20 F.3d at 1557. Stephens has not shown that the state lacked adequate procedures to correct any

deficiency in the pretermination hearing.[11] Accordingly, Stephens' procedural due process claim fails as a matter of law.

## Conclusion

Accordingly, the County's motion for summary judgment (Dkt. 66) is GRANTED. The County is entitled to summary judgment on Counts Two, Four, Five, and Six of the Second Amended Complaint. Because summary judgment has already been entered in favor of the County on Counts One and Three, the Clerk is directed to enter final summary judgment in favor of Defendant and close the file.

**DONE AND ORDERED** this  15th  day of March, 2012.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Unrepresented parties
Counsel of Record

---

[11] Stephens was given a post-termination hearing where he appeared through counsel and had the opportunity to testify, to offer exhibits, to call witnesses, to cross examine adverse witnesses, and to make a closing argument.